1  RANDOLPH E. DAAR
   506 Broadway
2  San Francisco, California 94133
   Telephone: (415) 986-5591
3  Facsimile: (415) 421-1331

4  Attorney for Defendant
   J. TONY SERRA

5

6

7

8                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
9                       SAN FRANCISCO DIVISION

10

11  UNITED STATES OF AMERICA,

12          Plaintiff,              CR 05-171

13      v.                          DEFENDANT'S PLEA AND
                                    SENTENCING MEMORANDUM
14  J. TONY SERRA,

15          Defendant.
    _____/
16

17                        **I. INTRODUCTION**

18          Pursuant to Plea Agreement, Tony Serra will enter pleas of

19  guilty to an Information charging him in two counts with a

20  misdemeanor violation of Title 26 U.S.C. 7203, Willful Failure to

21  Pay Income Tax, for the tax years 1998 and 1999. The United

22  States and Mr. Serra agree that the advisory United States

23  Sentencing Guidelines (USSG) in this case result in Total Offense

24  Level 12. Mr. Serra is a Criminal History Category I offender.

25          The terms and conditions of the Plea Agreement include

26  that Mr. Serra will pay restitution to the United States in the

27  amount of $100,000, representing unpaid taxes for the tax years

28  1997 through 2001, and that he maintains the right to move for a

                                  1

downward departure from the established guideline.[1]  Mr. Serra comes now before the Court requesting that the total circumstances of his offense behavior, his background and prior good deeds, and his obligations as a trial attorney, all warrant a sentence of probation.

## II. COURT CAN CONSIDER ALL RELEVANT FACTORS

Mr. Serra's pleas will be entered in the wake of the recent landmark decision in United States v. Booker, 160 L.Ed.2d 621, 125 S.Ct. 738 (2005).  Booker renders the Guidelines as advisory only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in Title 18 U.S.C. 3553(a). In the Booker Remedy Opinion, the Court stated:

> "We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U.S.C.A. 3553(b)(1) (Supp. 2004), incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, 3742(e) (main ed. And Supp. 2004), which depends upon the Guidelines mandatory nature. So modified, the Federal Sentencing Act, See Sentencing Reform Act of 1984, as amended, 18 U.S.C. 3551 et seq., 28 U.S.C. 991 et seq., makes the Guidelines effectively advisory. It requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A. 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see 3553(a) (Supp. 2004)." At 651.

The Guideline range is now neither mandatory, nor "presumptive," as the Court must now consider 18 U.S.C. 3553(a)

---

[1]  As the Guidelines are now advisory, formal downward departure motions are no longer necessary (see below).

1  in its entirety and impose a sentence "sufficient, but not
2  greater than necessary, to comply with the purposes set forth in
3  paragraph (2) of this subsection." The court, in determining the
4  particular sentence to be imposed, shall consider:

5      (1) The nature and circumstances of the offense and
          the history and characteristics of the
6          defendant;

7      (2) The need for the sentence imposed --

8          (a)  to reflect the seriousness of the offense,
               promote respect for the law and provide just
9               punishment for the offense;

10          (b)  to afford adequate deterrence to criminal
                conduct;
11
                (c)  to protect the public from further crimes of the
12               defendant; and

13          (d)  to provide the defendant with needed education or
                vocational training, medical care or other
14               correctional treatment in the most effective manner;

15      With the Guidelines advisory, they now become but one
16  factor to be considered by the Court in fashioning a sentence.
17  Indeed, the requirement of considering the provisions of 18
18  U.S.C. 3553(a) restores to the Court its power and obligation to
19  consider factors that the Guidelines effectively prohibited from
20  consideration (*e.g.*, Age, USSG 5H1.1; Education and Vocational
21  Skills, USSG 5H1.2; Mental and Emotional Condition, USSG 5H1.3;
22  Physical Condition Including Drug or Alcohol Dependence, USSG
23  5H1.4; Employment, USSG 5H1.5; Family Ties and Responsibilities,
24  USSG 5H1.6; Socio-economic Status, USSG 5H1.10; Civic and
25  Military Contributions, USSG 5H1.11; and Lack of Youthful
26  Guidance, USSG 5H1.12.). To consider the "history and
27  characteristics of the defendant," the Court must now consider
28  factors the Guidelines eschewed.  Therefore, in light of Booker,

3

the Court need no longer consider "departures," and may consider a more expansive set of facts for sentencing.[2]

### III. BACKGROUND

Tony Serra was born and raised in San Francisco. He is one of three sons born to his Spanish-Moorish father and Russian-Jewish mother. His parents had only elementary school educations and his father worked as a foreman in a jelly bean factory in San Francisco.  Tony's brothers are both accomplished.  His brother Richard, a resident of New York, is a world renowned sculptor[3] and his brother Rudy is an art professor at the University of Vermont. Raised in a modest working class home, Tony and his brothers were taught the values of ideas and art, not the value of material possessions. Tony has passed on those values to his own five children, Ivory, Shelter, Chime, Wonder and Lilac. All have university or post graduate degrees and are engaged in such fields as sculpture, photography, off-Broadway acting, play writing, movie producing and fashion.

Tony attended public schools in San Francisco, where, upon graduation from high school, he was awarded the Bank of America Giannini Award for most promising graduating student in the field of English. He was also an athlete, having earned "all-city" honors in both baseball and football. He also played varsity basketball. When he graduated he was offered the

---

[2]  As will be noted below, however, a number of sentencing factors the Court should consider as downward departure issues, even under a mandatory Guideline system, are present in this case.

[3]  Richard Serra's 140-ton steel sculpture "Ballast" was recently installed at U.C. San Francisco's Mission Bay Campus.

1  opportunity to play professional baseball. He opted to attend
2  Stanford University instead.

3       At Stanford, the sheer amount of activity in which Tony
4  engaged is staggering. He worked to support himself throughout
5  his time at Stanford, sometimes working the graveyard shift at a
6  nearby cardboard factory. He was academically outstanding. In
7  addition, Tony played varsity baseball and football, and was a
8  varsity boxer. He graduated in 1959 with a degree in Philosophy.
9  He then entered Boalt Hall, the University of California at
10  Berkeley Law School, at which he was in the top 10% of his class
11  and on Law Review. After graduation, he began his law career, as
12  a deputy district attorney in Alameda County. He left the
13  prosecutor's office one year later.

14       Tony Serra has been a trial lawyer, primarily criminal
15  defense and civil rights, for over 40 years.  His work has
16  resulted in numerous awards, including in 1982, runner-up "Best
17  Lawyer in America" by American Lawyer Magazine, 1992, Drug Policy
18  Foundation (Washington, D.C.) Achievement in the Field of Law,
19  1993 Boalt Hall Law Review "Alumnus of the Year," 1994 Charles
20  Garry Award, 1997 American Civil Liberties Union Benjamin Dreyfus
21  Civil Liberties Award, 2003 Lifetime Achievement Award by
22  McFetridge-American Inn of Court, and co-awardee of "2003 Trial
23  Lawyer of the Year" by Trial Lawyers for Public Justice. In
24  addition, Tony has been a speaker at hundreds of legal profes-
25  sional organizations, addressing many legal and social issues.
26  His work load is enormous, often resulting in actual trial work
27
28

1  as much as 11 months out of the year.[4]

2      Tony's success as a trial lawyer and advocate has not

3  translated, intentionally, into material aggrandizement. At the

4  beginning of his career, Tony eschewed the material benefits of a

5  successful law practice. In his own words:

6              I took an informal vow of poverty. I vowed
             that I would never take profit from the
7              practice of law, that I would not buy
             anything new, that I would recycle every-
8              thing, that I would own no properties - no
             stocks or bonds, no images of prosperity. I
9              still drive an old junk of a car. I still
             barely make the rent each month; I have
10             accumulated nothing by way of savings, and
             I live from hand to mouth.
11
             Unpublished Manuscript, "Lust For Justice -
12             Confessions of a Maverick Lawyer," J. Tony
             Serra and Paulette Frankl, p. 62.
13

14      Tony has never abandoned his vow and all who know him can

15  attest to his lifestyle as one who does not seek, nor value,

16  material possessions or success. Indeed, at any given time, fully

17  one half, and often more, of his case load is comprised of *pro

18  bono* cases, the costs of which he often pays out of his own

19  pocket. He has so little money, his children have been educated

20  by the generosity of their famous sculptor uncle.

21      The present prosecution occurs in the context of Tony

22  Serra's relationship to money. He has failed to **pay** taxes. He has

23  not failed to **file** taxes.[5]  He has entered into discussions with

24  ─────────────────

25      [4]  For the remainder of 2005 alone, Tony has six trials
    scheduled, the last of which, United States v. Flavia Sandoval,
26    is to commence on November 15, 2005, in U.S. District Court,
    Eastern District of California at Fresno.

27      [5]  The Court will be made aware that Mr. Serra previously
    failed to **file** tax returns, for which he was prosecuted and
28    punished. He learned that lesson and has not repeated it.

the government to endeavor to pay taxes that are owing.  Many people whom Tony has touched in his life and career are coming forward to aid him at this time and, through their efforts and compassion, will help Tony pay his debt to the government. Each person recognizes that it is Tony's somewhat dysfunctional relationship to money that lies at the root of his offense behavior and not greed or self-aggrandizement.

## IV. ANALYSIS OF SENTENCING FACTORS

In the wake of <u>Booker</u>, much scholarship has and will be forthcoming, providing guidance in federal sentencing. Several district courts have already been heard from and one in particular has provided a framework for sentencing in the realm of "advisory Guidelines." In <u>United States v. Ranum</u>, 353 F.Supp.2d 984 (E.D. Wisc. 2005), Judge Adelman stated:

> I determined that the factors set forth in § 3553(a) fell into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense. I analyzed each category and in so doing considered the specific statutory factors under § 3553(a), including the advisory guidelines. *14

Tying the court's analysis to the factors outlined in section 3553(a), enables appropriate review of the sentence.

> And in this instance those factors, in addition to the past two decades of appellate practice in cases involving departures, imply a practical standard of review already familiar to appellate courts: review for 'unreasonableness.' . . . Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.
> <u>Booker</u>, at 660-661.

7

**The Nature of the Offense:** "The Commission intends the
sentencing courts to treat each Guideline as carving out a
'heartland,' a set of typical cases embodying the conduct that
each Guideline describes.  When a court finds an atypical case,
one to which a particular Guideline linguistically applies but
where conduct significantly differs from the norm, the court may
consider whether a departure is warranted." (USSG Ch. 1, Pt A,
Section 4(b)).  *See*, <u>Koon v. United States</u>, 518 U.S. 81, 92 (1996)
(a departure is warranted if the case is "unusual enough for it
to fall outside the heartland of cases in the guidelines.") With
this statement, the Sentencing Commission expressed its
recognition that there are atypical cases that warrant special
consideration by the Court. Although this statement was
promulgated under the mandatory Guideline system, it is equally
applicable to the present case.

Typically, the failure to pay tax is motivated by greed,
financial desperation, or simple self-aggrandizement. None of
those motivations exists in the present case.[6]  Tony Serra's
failure to pay taxes, which he now intends to do with the help of
many friends, is the result of his vow of poverty, to which he
assiduously adheres, and his apparent "non-relationship" to
money. He lives a hand-to-mouth existence, buys virtually
nothing, and keeps only enough money to exist and pursue his
cases. As a result, even under an advisory Guideline system, the
Offense Level 12 agreed to by the parties clearly overstates this

[6] For example, if Mr. Serra were motivated by money, he
would not, as he did, refuse to accept any portion of the judg-
ment of over $4 million awarded in the <u>Judi Bari and Darryl
Cherney v. City of Oakland and FBI</u> case.

1   defendant's culpability. In <u>United States v. Brennick</u>, 134 F.3d

2   10 (1st Cir. 1998), the court allowed for a downward departure

3   where the sentencing court determined that the defendant's

4   motivation for the tax offense was relatively benign in

5   comparison to other tax evasion offenses. Such is the case here,

6   where Mr. Serra did not fail to pay taxes because he wished to

7   spend the money on other things. He simply did not have the

8   money.

9        Further, as another consequence of Mr. Serra's peculiar

10  relationship to money, the agreed upon "tax loss" for Guideline

11  purposes, and thus the Level 12 determination, is a tax loss that

12  does not factor in Mr. Serra's expenses. *See*, <u>United States v.</u>

13  <u>Martinez-Rios</u>, 143 F.3d 662 (2nd Cir. 1998) (the court can

14  consider legitimate but unclaimed deductions if it results in "a

15  more accurate determination" of tax loss.)  As indicated above,

16  Mr. Serra often funds costs in *pro bono* cases, costs for which he

17  has not sought deductions on his taxes.  Although it is true that

18  there is income on which he owes taxes, the figure is somewhat

19  less than the agreed upon tax loss in the Plea Agreement. The

20  exact figure we do not know because of an absence of records.

21        **The History and Character of the Defendant:**  Of course,

22  during the era of mandatory Guidelines, the Court was prohibited

23  from considering many factors that are directly related to the

24  history of the defendant (see above). That restriction is now

25  lifted. The Court may now ap+propriately consider Mr. Serra's age

26  of 70 (USSG 5H1.1), his physical condition and vulnerability

27  (USSG 5H1.4), his employment history and present employment

28  obligations (USSG 5H1.5), and his many civic contributions (USSG

9

1  5H1.11).

2       At age 70, Mr. Serra has undergone hip replacement
3  surgery. During his career, he cross-examined and effectively
4  compromised the value of many government informants, many of whom
5  populate the Bureau of Prisons. As the Court is aware, fully 60%
6  of all downward departures under the mandatory Guideline system
7  were for "substantial assistance" to the government. The number
8  of "snitches" in the Bureau of Prisons is enormous and Mr. Serra
9  is not well regarded by them.[7]  Indeed, there is concern that Mr.
10 Serra would be targeted by angry snitches, whose value he
11 diminished during cross examination and whose "benefits" may have
12 been reduced as a result of their diminished value. Physical
13 condition and vulnerability in prison are factors the Court may
14 consider at sentencing.

15      In United States v. Lara, 905 F.2d 599 (2nd Cir. 1990),
16 the court granted a downward departure for a defendant who
17 appeared physically vulnerable to menacing elements in the prison
18 system. Other courts have reached the same conclusion. *See*,
19 United States v. Graham, 83 F.3d 1466, 1481 (D.C. Cir. 1996),
20 United States v. Maddox, 48 F.3d 791, 797-98 (4th Cir. 1995),
21 United States v. Tucker, 986 F.2d 278,280 (8th Cir. 1993), *cert.*
22 *denied*, 114 S.Ct. 76 (1993), and United States v. Gonzales, 945
23 F.2d 525 (2nd Cir. 1991). In the Northern District of California,
24 a defendant whose guidelines called for a period of imprisonment
25 was sentenced to a halfway house after a downward departure for
26 potential vulnerability in prison. United States v. Bauer, CR 92-

27
28       [7]  As a personal policy, Mr. Serra will not represent
   government informants.

1  20027 RMW (1992).

2       Although under the present sentencing scheme the Court no
3  longer must identify a downward departure, section USSG 5H1.4,
4  Physical Condition, can now be considered in the context of the
5  provisions of 18 U.S.C. 3553(a) and is a factor to consider at
6  sentencing.

7       Tony Serra's sterling employment history and his present
8  professional obligations are also factors that the Court can
9  consider at sentencing.  Under the mandatory Guideline system, a
10  downward departure was allowed when the incarceration of the
11  defendant would have a dilatory effect on innocent employees of
12  the defendant. *See*, United States v. Milikowsky, 65 F.3d 4 (2nd
13  Cir. 1995). In Mr. Serra's case, his incarceration would have a
14  devastating effect on those clients whom he is presently
15  representing.  As indicated above, Mr. Serra has six more jury
16  trials scheduled for the year 2005 alone. There are 16 other
17  cases awaiting dates for trial, which will extend into 2006 and
18  perhaps beyond. It is possible that not all cases will proceed to
19  trial; however, historically, the vast majority of Mr. Serra's
20  cases do go to trial, rather than settle.  Any incarceration of
21  Mr. Serra that prevents him from appearing on behalf of his
22  clients will have an extraordinarily negative impact on their
23  cases and should be considered by the Court at sentencing.

24       In fashioning a sentence that recognizes the seriousness
25  of Mr. Serra's transgression, while at the same time considering
26  his history, the Court must consider all of the *pro bono* work Mr.
27  Serra has performed over the years.  For over 40 years of
28  practice, fully one-third to one-half of his caseload at any

given time is donated work. Indeed, Mr. Serra often funds cases
that he does for free.  The *pro bono* work Mr. Serra has done is
an extraordinary civic contribution that has forwarded the ends
of justice in America. It is a factor worthy of consideration by
the Court at sentencing.  *See*, United States v. Jones, 158 F.3d
492 (10th Cir. 1998) (defendant's long history of charitable
works justified downward departure), United States v. Sarafini,
233 F.3d 758 (3rd Cir. 2000) (charitable activities justified
downward departure), and United States v. Canoy, 38 F.3d 893 (7th
Cir. 1994) (charitable and civic activities may provide basis for
downward departure if exceptional).

**The Needs of the Public and the Victims of the Offense:**

Mr. Serra's deprivation of resources for the public weal renders
the "victim" of this case the public at large.  In determining a
sentence, then, it is incumbent upon the Court to balance the
public's deprivation of Mr. Serra's tax payments against the
monumental public service he has provided, not only through his
*pro bono* work, but also through his insistence upon the rights
and liberties of the people he represents before the courts of
this country. His valiant fight to protect the interests of the
accused has a far reaching effect for all persons accused, both
guilty and not guilty. The work of an effective defense lawyer
inures benefit to all citizens, as it demands that the system
adhere to constitutional principles and rules that protect people
from the wrath of the state.

Also, Mr. Serra will pay his taxes. Many friends have
stepped forward to provide funds with which Mr. Serra will make
full restitution. Under the mandatory Guideline system, the

courts recognized full restitution as a basis for a downward

departure. *See*, United States v. Miller, 991 F.2d 552 (9th Cir.

1993). Full restitution is a mitigating factor, as it is

emblematic of acceptance of responsibility and an indication of

future compliance with the law.

The "needs of the public and victim" are essentially the

need for payment of the taxes due and the possible deterrent

value of this case, during this, the "tax season."  Mr. Serra,

with the help of others, will pay his taxes due, according to the

requirements of the Plea Agreement, thus compensating the

"victim" of his offense.

The notion of deterrence has historically been very

difficult to assess.  There are those who believe that deterrence

exists and those who do not.  However, it can be categorically

stated that the publicity of this prosecution has already

achieved the potential for deterrence.[8]  The government is

reaping the publicity benefit of this case already. Mr. Serra is

accepting responsibility for his failure in this case and

acknowledges the government's right to collect taxes from him.

### V. CONCLUSION

J. Tony Serra will appear before the Court to enter pleas

of guilty to two counts of misdemeanor failure to pay taxes. He

will make restitution of $100,000 with the help of a number of

people who are supportive of him.

It is requested that the Court consider the overall

circumstances of both the offenses before the Court and the

---

[8]  The charges against Mr. Serra were already published in local newspapers.

1    background and history of Tony Serra. He is truly an unusual

2    defendant who brings a complex set of factors to be analyzed for

3    sentencing. Primarily, the Court should consider the etiology of

4    this offense, that is, Mr. Serra did not fail to pay taxes

5    because of self-aggrandizement or greed.  He failed to pay taxes

6    because he has very little money, he does not seek material

7    things, he is a lousy record keeper, and he has devoted his life

8    to his work and a vow of poverty.

9         On the one hand, the Court should consider the nature of

10   this offense and its seriousness.  On the other, it should

11   consider the remarkable contributions that Tony Serra has made to

12   our society and certainly to our system of justice.  The Court

13   should also consider the impact incarceration of Tony will have

14   on his present clients, who have placed their faith in him.  He

15   has a demanding trial schedule that he can fulfill if given the

16   opportunity.

17        For the reasons indicated above, it is respectfully

18   requested that the Court sentence Tony Serra to a period of

19   probation, upon condition that he complete payment of restitution

20   according to the Plea Agreement, and that he serve a period of

21   home detention that allows him to meet his professional

22   responsibilities.

23        Dated: April 5, 2005

24                                   Respectfully submitted,

25

26        _____

27        RANDOLPH E. DAAR
          Attorney for J. TONY SERRA

28

                                  14